IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL J. McKEOWN,

        Plaintiff,

        v.

THE PAUL REVERE LIFE
INSURANCE CO. and UNUM CORP.,

        Defendants.

No. CV 08-537-MO

OPINION & ORDER

**MOSMAN, J.,**

    Dr. Michael J. McKeown brought suit against the Paul Revere Life Insurance Co. and Unum Group[1] for payment on a disability income benefits policy issued by Paul Revere and administered by Unum Group (collectively "Paul Revere"). Dr. McKeown alleges that Paul Revere has breached its contract with him by failing to continue disability payments after his sixty-fifth birthday for his accident-induced disability. Paul Revere counters that Dr. McKeown's disability is a result of sickness and that it has fulfilled the obligations of the contract by paying disability benefits until Dr. McKeown's sixty-fifth birthday.

## BACKGROUND

    In the late summer and early fall of 1973, 1974, and 1975, Dr. McKeown used the chemical pentachlorophenol ("penta") to preserve the wood frame of his house. (Hallinan Decl.

---

[1] Unum Corporation is now known as Unum Group. (Answer (#8) 1 n.1.)

PAGE 1 - OPINION & ORDER

(#20) Ex. 1 at 9:13-10:1, 117:5-10.)  He does not recall exactly how many hours per day, days per week, or weeks per year he worked on this project.  (*Id.* at 14:18-16:12, 19:4-20:24.)  Dr. McKeown mixed the penta with diesel and applied it to the house while wearing a respirator and coverall.  (*Id.* at 121:17-122:16, 118:17-19, 119:1-5.)  The cloth of the coverall became soaked with the mixture of diesel and wood preservative by the end of each day, allowing the chemical to touch his skin.  (*Id.* at 120:14-15.)

Dr. McKeown purchased a disability benefits policy ("the policy") from Paul Revere effective November 25, 1974.  (Bialy Decl. (#22) ¶ 2, Ex. 1 at 1.)  The policy pays out monthly upon disability, starting on the ninety-first day of the disability.  (*Id.* Ex. 1 at 2-4.)  Disability from sickness pays until age sixty-five and disability from accident pays for life.  (*Id.*)

On February 27, 1997, Dr. McKeown submitted a claim for benefits for disability due to sickness.  (*Id.* ¶ 3, Ex. 2.)  He stated he was no longer able to act as a physician due to his limb girdle muscular dystrophy.  (*Id.* Ex. 2.)  Limb girdle muscular dystrophy is listed in the "sickness" portion of the form, while the "accident" portion of the form is marked "NA."  (*Id.*)  Under the policy, Dr. McKeown has the burden of proving the cause of his disability and was required to provide proof of the disability to support each periodic disability payment.  (*Id.* Ex. 1 at 8.)  Dr. McKeown's doctor provided a statement to Paul Revere confirming the diagnosis of muscular dystrophy.  (*Id.* Ex. 2 at 6.)  Apparently, Paul Revere then began paying out on the policy.

Dr. McKeown submitted attending physician statements in support of his disability claim periodically over the next six years.  (*Id.* Exs. 3-12.)  All the reports indicate that Dr. McKeown is suffering from progressive limb girdle muscular dystrophy.  (*Id.*)  Paul Revere discontinued

benefit payments to Dr. McKeown after his sixth-fifth birthday, December 13, 2000, as dictated by the disability-due-to-sickness provision of the policy. (*Id.* ¶ 5; Hallinan Decl. (#20) Ex. 1 at 27:23-24 (plaintiff stated that his date of birth is December 13, 1935).)

In a letter dated February 21, 2006, Dr. McKeown wrote to Unum's Claim Reassessment Unit, stating that he had come to believe his disability to be the result of exposure to a toxic chemical, rather than the result of a disease. (Bialy Decl. (#22) ¶ 6, Ex. 13 at 1.) An exposure to a toxic chemical would qualify as an accident, rather than as a sickness, thus entitling Dr. McKeown to disability payments for the rest of his life under the policy. (*Id.*) In a Reassessment Information Form, Dr. McKeown stated he believed his physical condition was due to heavy exposure to the chemical penta in 1973, 1974, 1975, and 1976. (*Id.* Ex. 13 at 6.) Unum informed Dr. McKeown by letter dated February 28, 2006, that his request for reassessment was denied as untimely. (*Id.* ¶ 7, Ex. 14.)

The matter now before the court is Paul Revere's Motion for Summary Judgment (#17). Because Dr. McKeown has offered no admissible evidence supporting his claim that his disability is caused by his exposure to penta, I hold that there are no genuine issues of material fact in this case and GRANT Paul Revere's Motion for Summary Judgment (#17).

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). If the

PAGE 3 - OPINION & ORDER

movant initially shows that no genuine issue of fact exists for trial, the non-moving party cannot then rest on the pleadings but must respond with evidence setting out "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party has the "burden of advertising [sic] to 'specific facts showing that there is a genuine issue for trial.' . . . It is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## DISCUSSION

Dr. McKeown contends that summary judgment is improper in this case because a central question of fact remains: Are Dr. McKeown's symptoms of limb girdle muscular dystrophy caused by sickness or by accident? This question is outside the knowledge or understanding of the average juror and is therefore a question that requires expert medical testimony.

**I.    Standard for Admissibility of Expert Medical Testimony**

Expert testimony must satisfy the standards set forth in the Federal Rules of Evidence, primarily Rule 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 requires that expert testimony be based on sufficient facts or data, be the product of reliable principles and methods, and that the expert witness apply the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. "Under *Daubert*, the district court acts as a 'gatekeeper,' excluding 'junk science' that does not meet the standards of reliability required under Rule 702." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).

//

This gatekeeper function is accomplished by assuring that the evidence is both relevant and reliable. *Id.* (citing *Daubert*, 509 U.S. at 589-95). "Scientific evidence is deemed reliable if the principles and methodology used by the expert proffering it are grounded in the methods of science." *Id.* (citing *Daubert*, 509 U.S. at 592-95). The Supreme Court has given a non-exhaustive list of factors for the determination of the reliability of scientific testimony, including: "(1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Id.* (citing *Daubert*, 509 U.S. at 593-94). The Ninth Circuit has further explained that, "if an expert did not conduct his or her own research, independent of the litigation, on the subject of the testimony, the district court must determine whether there exists any 'objective, verifiable evidence that the testimony is based on scientifically valid principles.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317-18 (9th Cir.1995)).

## II.     Dr. McKeown's Evidence Does Not Meet This Standard

As the plaintiff, Dr. McKeown bears the burden of proving that his exposure to penta was the probable cause of his disability. *La Barge v. United Ins. Co.*, 306 P.2d 380, 383 (Or. 1957). To prove causation in a toxic tort case, he must proffer admissible evidence demonstrating both generic and specific, or individual, causation. *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002) (citation omitted). "General, or 'generic' causation . . . [exists when] the substance at issue had the capacity to cause the harm alleged, while 'individual causation' refers to whether a particular individual suffers from a particular ailment as a result of

exposure to a substance." *Id.* (citations omitted).  In other words, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (citing *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996)).

### A.    *Generic Causation*

Dr. McKeown has not provided admissible evidence of generic causation.  Dr. McKeown is board certified in obstetrics and gynecology.  (Hallinan Decl. (#20) Ex. 1 at 124:5-18.)  However, he is not an expert in neurology and indicates that he would not feel qualified to offer a medical opinion in the realm of neurology.  (*Id.* at 124:19-24.)  During his deposition Dr. McKeown stated that he has never conducted any studies on the effects of penta and although he has read a few, he is not very familiar with such studies.  (*Id.* at 129:11-130:20.)  More recently, he has said that in 2005 he researched whether his exposure to penta might have caused his disability by reading widely accepted medical journal articles.  (McKeown Decl. (#26) ¶ 7.)  He states that he is aware of epidemiological studies that propose a possible link between penta and symptoms of a progressive limb girdle muscular dystrophy, including some by a Dr. John Fink.  (*Id.*)  He further states epidemiologic reports exist stating that those who have been exposed to penta have developed long lasting muscle weakness and wasting similar in effect to muscular dystrophy.  (*Id.*)  Muscular dystrophy is a progressive, untreatable, incurable illness.  However, in 2005, Dr. McKeown started a physical fitness regime with a personal trainer, which he indicates caused his dystrophic systems to reduce and allowed him to become more physically fit.  (*Id.* ¶ 5.)  Based on his experience with the trainer and his research, Dr. McKeown states that

it is his "informed medical opinion that [his] exposure to Penta caused [his]: muscle weakness, tremors, loss of balance due to muscle weakness and loss of muscle mass."  (*Id.* ¶ 8.)

Dr. McKeown's opinion, even though he is himself a physician, is not admissible as an expert opinion in the realm of neurology or toxicology.  First, he does not meet the standard set by Rule 702, which requires an expert to be qualified "by knowledge, skill, experience, training, or education" in the field in which he is offering an opinion.  Fed. R. Evid. 702.  He has no particularized training in neurology or toxicology and has admitted that he is not qualified to offer a medical opinion regarding neurology.  (Hallinan Decl. (#20) Ex. 1 at 124:19-24.)

Second, Dr. McKeown's research does not meet the requirements of reliability set forth in Rule 702.  None of the studies upon which Dr. McKeown relies are identified for the court.  The author of one of the studies is identified, Dr. Fink, but the study itself and an opinion by Dr. Fink are notably absent.  No evidence is put forward regarding how the studies Dr. McKeown read were conducted, whether the studies could be replicated, whether the studies were subject to peer review, what the error rate was, or whether the theory or technique was generally accepted in the relevant scientific community.  *See Domingo*, 289 F.3d at 605 (citing *Daubert*, 509 U.S. at 593-94).  Dr. McKeown does not indicate how he conducted his research in the medical journals, how many journals he read, or even which journals he read.  Thus, Dr. McKeown's opinion does not amount to sufficient admissible evidence regarding generic causation.

Dr. McKeown has failed to provide any other expert opinion or evidence on the subject.  Thus, the only evidence before the court is that provided by Paul Revere's expert witness, Dr. Brent Burton.  Dr. Burton is a fellow of the American College of Medical Toxicology and the American Academy of Clinical Toxicology, and a member of the American College of

Occupational and Environmental Medicine.  (Burton Decl. (#21) Ex. 1 at 4.)  He has written scientific articles and book chapters on the effects of toxic substances on the human body and is currently a clinical associate professor at Oregon Health Sciences University, where he has worked since 1981.  (*Id.* at 1-2, 5-6.)  He is therefore qualified "by knowledge, skill, experience, training, [and] education" in the field in which he is offering an opinion.  Fed. R. Evid. 702.  Dr. Burton has testified that out of the more than 2,000 journal articles published in medical literature over the last four decades regarding the toxicologic effects of penta, none has found an association with any form of muscular dystrophy.  (Burton Decl. (#21) ¶¶ 8-9.)  In fact, none has found "any indication that [penta] causes any form of muscle pathology that is similar to muscular dystrophy."  (*Id.* ¶ 9.)  The only admissible evidence in the record states that exposure to penta does not cause symptoms similar to muscular dystrophy.  Thus, I hold that the record does not demonstrate a genuine issue of material fact as to this question.

**B.**     *Specific Causation*

Dr. McKeown has not provided sufficient evidence of specific causation.  He has testified that in 1973, 1974, and 1975 he had "heavy exposure to [penta] on [his] skin for three weeks in the summer of each of those years." (McKeown Decl. (#26) ¶ 2.)  He does not recall exactly how many hours per day or days per week he worked on this project.  (Hallinan Decl. (#20) Ex. 1 at 14:18-16:12, 19:4-20:24.)  Nor does he remember how strong the concentration of penta was in the product he purchased or the concentration of the mix he made with the penta and diesel.  (*Id.* at 122:2-25.)  Finally, Dr. McKeown indicates that his skin was red and burning after his exposure.  (*Id.* at 119:22-120:7.)

//

PAGE 8 - OPINION & ORDER

From this testimony it is impossible to tell to how much penta Dr. McKeown was exposed. Nor has Dr. McKeown provided expert testimony concerning the symptoms that can be caused by this type of exposure to penta. Dr. Burton states that skin exposure "would not result in significant absorption of [penta] but could cause local skin irritation." (Burton Decl. (#21) ¶ 7.) "[B]ased upon the description provided by Dr. McKeown, it is unlikely that he encountered an exposure to [penta] capable of causing any symptoms beyond acute transient perceptual annoyance/irritation." (*Id.*) Thus, the record does not demonstrate a genuine issue of material fact as to whether Dr. McKeown was exposed to a dangerous amount of penta.

## CONCLUSION

For the foregoing reasons, I GRANT Paul Revere's Motion for Summary Judgment (#17).

IT IS SO ORDERED.

DATED this   25   day of May, 2009.

                                                   /s/ Michael W Mosman
                                                   MICHAEL W. MOSMAN
                                                   United States District Judge